Roy E. Ellegard v. Commissioner.
Ellegard v. Commissioner
Docket No. 10927.
United States Tax Court
1948 Tax Ct. Memo LEXIS 110; 7 T.C.M. (CCH) 590; T.C.M. (RIA) 48161; August 24, 1948
*110 1. Respondent's determinations that petitioner received rebates or "kickbacks" from the president of a motor transportation company which constituted income in several years are sustained. 2. Fraud penalties for failure to report such income are sustained. Dennis P. O'Connor, Esq., for the petitioner. Paul P. Lipton, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined deficiencies in petitioner's income tax for the years and amounts set forth below. The deficiencies result from determination of the respondent that the petitioner received *111 income in each of the years which he failed to disclose in his returns. Respondent claims that the petitioner omitted income from his returns with intent to evade taxes, and on this account he has added 50 per cent additional tax for each year (Section 293 (b), I.R.C.) Year
Deficiency
50% Addition
1933
$ 29.51
$ 14.76
1934
159.48
79.74
1935
312.50
156.25
1936
291.43
145.72
1937
214.45
107.23
1938
225.51
112.76
1939
211.24
105.62
1940
242.97
121.49
1941
172.34
86.17
Total
$1,859.43
$929.74
Petitioner's returns were filed with the collector for the district of Connecticut. Petitioner denies that he received the income which the respondent claims he received in each of the taxable years. The respondent introduced evidence with respect to the fraud issue. Findings of Fact The parties have stipulated certain facts. The facts which have been stipulated are found as facts. The stipulation is incorporated herein by this reference. Petitioner, Roy E. Ellegard, and his wife, Helen P. Ellegard, are residents of West Hartford, Connecticut. They have one child who was born in 1927. Petitioner entered the employ *112 of the Fuller Brush Company, Hartford, Connecticut, as a clerk, on January 27, 1921, at a salary of $22 per week. He was in the employment of the Fuller Brush Company, hereinafter called the Company, continuously until March 19, 1942. From 1927 until the termination of his employment, petitioner was traffic manager for the Company. He had sole responsibility for engaging carriers for transportation of the company's products; he was in charge of the shipping to various warehouses, and had duties relating to keeping the warehouses stocked, making up orders covering shipments, and making up production schedules. The Fuller Brush Company manufactures household and industrial brushes and cleaning compounds in Hartford, Connecticut. During the taxable years in question it had warehouses located in various cities in the East and Mid-West, and on the West coast. Shipments of brushes to those warehouses were made by truck and railroad with the exception of shipments to the West coast, substantially all of which were trucked to New York and transported from that point by boat. The salary paid to petitioner by the Company for the years 1925 to 1941, inclusive, was as follows: Year
Salary
1925
$3,900
1926
3,900
1927
4,500
1928
4,800
1929
5,000
1930
5,000
1931
4,420
1932
4,100
1933
$3,340
1934
3,380
1935
3,380
1936
3,900
1937
4,130
1938
4,130
1939
4,500
1940
6,000
1941
7,000
*113 In addition to his cash salary, petitioner received stock bonuses as follows: 1926, $400; 1939, $300; 1940, $500. No other items or amounts of income were reported by petitioner in his income tax returns for the years 1933 to 1941, inclusive, except dividends. Dividends were reported as follows: 1936
$ 99.50
1937
169.20
1938
141.50
1939
220.25
1940
281.35
1941
311.50
The total sums of the salary of petitioner and of the dividends which were reported in his returns for the years 1933 through 1941 are as follows: Year
Salary
Dividends
Total
1933
$ 3,340
$ 0
$ 3,340.00
1934
3,380
0
3,380.00
1935
3,380
0
3,380.00
1936
3,900
99.50
3,999.50
1937
4,130
169.20
4,299.20
1938
4,130
141.50
4,271.50
1939
4,500
220.25
4,720.25
1940
6,000
281.35
6,281.35
1941
7,000
311.50
7,311.50
Total
$39,760
$1,223.30
$40,983.30
Petitioner's wife did not file separate income tax returns for any year during 1933 to 1941, inclusive, but dividends which she received on stocks were reported in the returns of petitioner. Petitioner was regarded by the officers of Fuller Brush Company as a very competent employee and *114 an important department head, and they had confidence in him and trusted him. His authority and control over the traffic department was virtually complete, and no check was made of his work excepting that which was involved in the audits which were made of accounts by an independent accounting firm, and the checking of freight bills by an outside concern which checked bills for rates, duplications, and other errors. In 1932, Benjamin Faiman organized a corporation which carried on a motor transportation business under the name of Faiman Motor Lines, Inc., hereinafter called Faiman Lines. Its place of business and office was in Hartford, Connecticut. Benjamin Faiman was president, and he and his wife owned the stock. Faiman and petitioner had known each other since 1928. Faiman solicited business of Fuller Brush Company in the latter part of 1932. Petitioner agreed to allocate shipments to his line, and thereafter, until about the summer of 1941, Faiman received a great deal of the Fuller Brush business. Faiman Lines operated eight to twelve trucks, and later twenty. Fuller Brush had warehouses at Camden, New Jersey, and on Long Island. Its goods were shipped to places in Connecticut, *115 to New York, and Camden, New Jersey. Also, it made regular shipments to Hamilton and Toledo, Ohio, and to other cities west of Ohio. Faiman Lines sent its trucks to New York, New Jersey, Long Island and to places in Connecicut, but it did not usually send them to Ohio and West. Petitioner and Faiman made an arrangement between themselves in the latter part of 1932 that Faiman would act as "broker" for the shipments which were to go to Ohio and West. He arranged for other carriers to carry shipments on their return trips to Ohio and to the West, and gave them terminal facilities at Fairman Lines for their trucks. He billed Fuller Brush for the entire charges. For his services he charged the other carrier a commission which amounted to 20 per cent of the freight charge from 1933 through 1938. He retained the commission and paid the carrier the charges which he collected from Fuller Brush after the commission. Later the commission which he charged was reduced to 15 per cent in 1939; 10 per cent in 1940; and 6 per cent in 1941. Most of the shipments to Ohio were carried by the Ward Line which was operated by Loren Ward. He is no longer living. Under the above arrangement, Faiman handled *116 the Fuller Brush shipments to Ohio and other western areas in addition to the shipments in Connecticut, New York and New Jersey which were carried by Faiman Lines. At first Faiman acted as a "broker" for others, when 95 per cent of his brokerage business was the Fuller Brush business; but later, the only brokerage business he did was the Fuller Brush business. At first, he billed Fuller Brush for the shipments which he, as a "broker" arranged to be carried by others on bill-heads of Faiman Lines, but in 1933 he adopted for purposes of his "broker" business the name of Connecticut & Ohio Freight Lines and had bill heads printed with that name. Connecticut & Ohio was not a separate corporation or separate business. The receipts from commissions were entered in the books of the Faiman Lines at all times. No separate income tax returns were filed for Connecticut & Ohio, but commissions were included in the gross income of Faiman Lines in the income tax returns of that corporation until 1939. In the returns of Faiman Lines for 1939, 1940, and 1941, a separate item of income was reported as commissions. The commissions which were reported separately for those years were as follows: 1939, *117 $5,454.92; 1940, $3,834; and 1941, $1,077.72. In 1935, a Federal statute known as the Motor Carrier Act of 1935 was enacted which was effective October 1. 1935, for certain purposes, and, in general, became effective at the latest on April 1, 1936. This Act became Part II, of the Interstate Commerce Act. Under section 311 of that Act, a license was required to engage in the business of a motor transportation broker. The Act provided for temporary licenses to those who acted as brokers at the time the Act went into effect. Also, motor carriers had to be licensed under the Act to carry freight in interstate commerce, and they were licensed to operate within certain areas. Faiman Lines received a license to carry on a motor transportation business but its license did not authorize it to operate trucks in Ohio or in other states west of Ohio. The Interstate Commerce Commission administers the Motor Carrier Act. At some time after 1936, Faiman Lines sent its own trucks to Akron, Ohio, Chicago, and Minneapolis, and other places in violation of its motor transportation license. On February 12, 1936, Faiman filed an application for a broker's license under the Motor Carrier Act with *118 the Interstate Commerce Commission. Petitioner was the only witness or endorser who appeared at a hearing in support of his application. At the hearing petitioner stated that the Fuller Brush Company had no facilities of its own by which it could satisfactorily arrange for motor carrier transportation, and that Faiman's services were necessary and convenient. In a report dated June 10, 1941, the Interstate Commerce Commission denied Faiman's application for a broker's license. In denying the application, the report stated that no motor carriers supported the application, and that there was nothing in the record to show that Faiman, as a broker, could render services of real value to carriers. Dean F. Noble, an agent in Hartford, Connecticut, of the Bureau of Motor Carriers of the Interstate Commerce Commission, investigated Faiman Motor Lines in each year, 1936 to 1941, inclusive. He was, and is, district supervisor for the district which includes Hartford. His duties included investigation of motor carriers to ascertain whether they violated any of the provisions of the Motor Carrier Act of 1935. Under section 322 (c) of that Act, it is unlawful for any person whether carrier, *119 shipper, or broker, or employee, agent, or officer to offer or give, or accept or receive any rebate or concession, and conviction of violation of this section carries a fine of $500 and not more than $2,000. Noble investigated Faiman Motor Lines to ascertain whether or not it or Faiman, himself, had violated the provisions of section 322 (c) of the Motor Carrier Act, as well as any other provisions. Noble found that Faiman's equipment was not of the best, that his service was mediocre, and that he was conducting what was called a brokerage operation in which Fuller Brush was turning over its freight to Faiman for movement to the West. Noble considered the "broker" arrangement strange because he couldn't visualize that Fuller Brush Company needed a broker to move its materials from factories and warehouses when it maintained a traffic department. In 1941, in the investigation made by Noble, he found that Faiman Motor Lines had violated one of the conditions of its license by operating trucks in unauthorized areas. He confronted Faiman with this evidence, and interrogated him about paying rebates. Faiman then made oral admissions to him in October 1941, and a sworn statement in *120 December 1941, that he had been paying petitioner one-half of brokerage commissions, and five cents per hundred pounds of freight carried by Faiman Lines during the period 1933 to 1941, inclusive. In the early part of 1942, Frank Adams and Henry Fowler, officers of Fuller Brush made a check of the traffic department records, and in particular of freight bills, upon the suggestion of Noble. The investigation disclosed that duplicate freight bills had been paid during the years 1934 to 1936 - two in 1934, three in 1935, and one in 1936 - in the total amount of $1,110.57. Adams asked petitioner to resign from his job. Petitioner resigned on March 19, 1942. Faiman Motor Lines filed a petition in bankruptcy in March 1942. Faiman Motor Lines was adjudged bankrupt in 1943 or 1944, and its license and assets were sold. The Interstate Commerce Commission did not bring charges against Faiman or file any information or proceeding against him or Faiman Motor Lines for violation of the Motor Carrier Act. Also, it did not file any proceedings against petitioner or Fuller Brush Company. When Faiman obtained Fuller Brush shipments for the first time in 1932, there was no agreement that he *121 would give rebates to Ellegard. Later in that year it was agreed that Faiman would pay petitioner one-half of the broker's commissions, and this agreement was carried out for eight or nine years. In 1933 it was agreed that Faiman would pay a rebate to petitioner of five cents per hundred pounds of goods shipped on Faiman Motor Lines, and this agreement was carried out for eight years. The name of Connecticut & Ohio Freight Lines was used so that all of the freight bills sent to Fuller Brush Company by Faiman would not be from Faiman Motor Lines. The treasurer of Fuller Brush Company did not know that Faiman had any connection with Connecticut & Ohio prior to Noble's communications to the Company. Faiman submitted duplicate freight bills, infrequently, and gave one-half of the proceeds to petitioner prior to 1936, but thereafter, because of the enactment of the Motor Carrier Act this practice was dropped. Also, Faiman padded the amounts of freight bills from time to time, and gave half of the excess charges to petitioner. All payments of rebates to petitioner were made in cash, usually at the end of each week. The payments were made on the basis of five cents per hundred pounds *122 for freight carried, and were one-half of the broker's commissions. In each year, at least one-half of all rebates paid to petitioner were for his share in the broker's commissions. Weekly payments increased from about $60 a week in 1933, to $100 and $125 per week in 1936 and thereafter. Care was taken that no records were kept. Faiman charged the disbursements which he made to petitioner to entertainment expenses in the books of Faiman Motor Lines at first, and, later, to his own salary account. Faiman Lines and Connecticut & Ohio received from 75 to 81 per cent of all of the shipments of Fuller Brush from 1933 to 1939. Of the shipments carried by Faiman Motor Lines, the shipments to Long Island and Camden, New Jersey represented about 75 per cent of the shipments. The Long Island business was the most important. In the spring or summer of 1941, petitioner withdrew the Long Island shipments from Faiman Motor Lines and gave them to Wooster Express. Two circumstances occurred in the early summer of 1941 which reduced the business of Faiman Lines considerably, the denial by the Interstate Commerce Commission of Faiman's application for a license to do business as a broker for motor *123 carriers, and the loss of the Fuller Brush shipments to Long Island. Faiman was in financial difficulties, and to obtain capital he sold stock in Faiman Lines to three men who became his associates in the business. Thereafter, he discontinued paying rebates to petitioner. Shipments (in pounds transported) of Fuller Brush which were handled by Faiman Motor Lines for the years 1933 to 1941, inclusive, were as follows: 1933
108.849
1934
751,879
1935
1,334,680
1936
2,217,213
1937
2,172,526
1938
2,702,491
1939
1,285,462
1940
1,657,834
1941
1,793,846
Total
14,024,780
Payments were made by Fuller Brush Company during the period 1933 through 1941 for the freight charges of motor carriers other than Faiman Motor Lines as set forth below. The Connecticut & Ohio Freight Lines or Benjamin Faiman acted as broker for the other carriers in obtaining the shipments for which the following freight charges were made, and was entitled to receive a commission from the carriers for the brokerage service: 1933
$ 6,833.47
1934
29,448.14
1935
46,382.17
1936
47,369.88
1937
40,426.98
1938
39,471.07
1939
42,487.35
1940
36,709.27
1941
5,299.16
*124 Petitioner had a checking account in the Phoenix State Bank and Trust Company in Hartford, in 1932. It was closed in 1934. Deposits in this account totalled $655 in 1933, and $215 in 1934. Helen Ellegard, petitioner's wife, had a checking account in the Phoenix State Bank from 1925 through 1941. The account was not a joint account, but petitioner was authorized to draw checks on that account which he did, but only infrequently. The Ellegards were known at the bank. Mrs. Ellegard had been employed there prior to her marriage. Mrs. Ellegard made deposits of funds of her mother in her own bank account; and, in 1940, she deposited $8,762.28 in the account upon transfer of accounts from the estate of an aunt, Mrs. Ellen Peberdy. The aunt lived in New Hampshire. She forwarded funds to Mrs. Ellegard to make purchases for her during her lifetime, which was within the period 1933 to 1941. Mrs. Ellegard deposited about $200 in her account in 1933 which came from the estate of petitioner's mother. The mother of Mrs. Ellegard was employed during all or part of the period 1933 to 1941 as a nurse. During the years 1932 until 1938 she was a nurse stewardess of the Panama Pacific Steamship *125 Company, working on ships going from New York to San Francisco. She lived with petitioner and her daughter from time to time. She turned over some of her earnings to her daughter, and dividends on stock she owned, which were deposited in Helen Ellegard's bank account. The salary checks of petitioner were deposited in his wife's checking account. The Ellegards purchased a home in 1933 which cost $8,200, subject to a first mortgage of $5,000, and a second mortfage of $1,600. The second mortgage was paid in 1934. They bought stocks as a family investment. They owned a Buick automobile. In 1941, petitioner owned Fuller Brush stock of a value of about $4,000. Petitioner loaned money to Faiman in 1936, 1937, and 1940, in the amounts of $500, $200, and $1,500, respectively. When the latter loan was made in 1940, the mother of petitioner's wife advanced $1,200 of the loan. Faiman repaid the loans. The total deposits in each year in the bank account of Helen Ellegard, exclusive of deposits totalling $8,762.28 in 1940, were as follows: 1933
$3,601.88
1934
4,381.36
1935
4,435.25
1936
5,560.50
1937
7,006.10
1938
4,632.33
1939
4,847.63
1940
6,444.02
1941
7,831.75
*126 During the years 1933 to 1941, inclusive, petitioner received from Benjamin Faiman cash payments, exclusive of repayments of loans, which amounted to at least the sums set forth below, as follows: 1933
$ 737.77
1934
3,682.38
1935
5,740.79
1936
4,974.86
1937
4,118.29
1938
4,311.58
1939
3,829.28
1940
2,664.39
1941
1,055.90
Total
$27,795.24
The above amounts constituted income to the petitioner in each of the taxable years. Petitioner, with intent to evade tax, fraudulently failed to report the above amounts of income in his income tax returns for the respective years. All or part of the deficiencies due from petitioner for the years 1933 to 1941, inclusive, are due to fraud with intent to evade tax. Opinion The respondent has determined that petitioner received certain income in each of nine years beginning in 1933 and ending in 1941, and that he failed to report such income in income tax returns. Except for a few small adjustments which are not contested, the deficiencies result from increasing petitioner's income in each year by the amounts of the disputed income. Respondent has determined, further, that all or part of the deficiency in *127 each taxable year is due to fraud with intent to evade tax, and he has increased the amount of each deficiency by 50 per cent under the provisions of section 293 (b) of the Internal Revenue Code. Respondent alleges that petitioner filed false and fraudulent returns with intent to evade tax; that he understated his income in each year by certain amounts; and that the alleged unreported income was received by petitioner from Benjamin Faiman. Petitioner, by his pleadings and his testimony denies all of the allegations of the respondent relating to the alleged income, and that he filed false and fraudulent returns. The Question of Fraud The first question to be determined is whether petitioner's income tax returns for each of the years in question were false and fraudulent, with intent to evade tax. Section 1112 of the Internal Revenue Code places the burden of proving that petitioner is guilty of fraud with intent to evade tax upon the Commissioner. The problem under this issue is one of evidence. The ordinary preponderance of evidence is not sufficient to sustain a determination of fraud. The evidence must be clear and convincing *128 that the returns of the petitioner were fraudulent. The rule is well known. See M. Rea Gano, 19 B.T.A. 518; Budd v. Commissioner, 43 Fed. (2d) 509; Henry S. Kerbaugh, 29 B.T.A. 1014, 1015, 1016; aff'd., 74 Fed. (2d) 749. To establish that petitioner filed false and fraudulent returns, respondent introduced the testimony of Benjamin Faiman. He relies principally upon this testimony. He introduced, also, the testimony of Dean F. Noble, an agent of the Interstate Commerce Commission, and of Adams and Fowler, officers of Fuller Brush Company. The testimony of these witnesses serves to corroborate Faiman's testimony. Other testimony, certain stipulations, and a few exhibits comprise the evidence which was introduced by the respondent. There has been reference in the record to the Motor Carrier Act of 1935, which is known now as Part II of the Interstate Commerce Act. The Act was enacted on August 9, 1935. Therefore we have deemed it necessary, and we have found it helpful, to take judicial notice of this Federal statute, which we may do. See Title 29, par. 16 to end, U.S.C.A., 119 Ch. 8; sections 304, 307, 308, 311, 312, *129 322. Since the testimony of Faiman in this proceeding, and the testimony of Noble relating to Faiman's admissions to him under oath in December 1941, relate to payments of rebates which are made illegal by section 322 of the above statute, the pertinent parts of section 322 are set forth in the margin.[1]
*130 It is noted that counsel for petitioner did not challenge the admissibility of Faiman's testimony in this proceeding. However, he directed part of his cross-examination to matters which could weaken the credibility of the testimony. On brief, petitioner asserts that Faiman's testimony about paying rebates to him is not true, and he contends that the record shows that Faiman is not a credible witness. Consideration has been given to all of these contentions. The first question relates to the weight which may be given properly to Faiman's testimony. His testimony in this proceeding is to be treated like that of any witness, with, however, the application of close scrutiny because of the unusual circumstances. See 16 Corpus Juris 693, 694; pars. 1418, 1420; Chandler v. State, 230 S.W. 1002, 1003. See, also, John Kehoe, 34 B.T.A. 59; aff'd., 309 U.S. 277. The chief factor which requires that his testimony be closely scrutinized is that it involves the same admissions which he made to an agent of the Interstate Commerce Commission in 1941 under his inducement of recommending lenient fines for violations of the Motor Carrier Act. Also, in 1941 he *131 had lost the Long Island shipments of Fuller Brush which constituted a considerable portion of the Eastern shipments, and he was mad at petitioner for having allocated that business to another line, Wooster Express. We have exercised particular care in our analysis and consideration of Faiman's testimony. It is corroborated in many respects by Noble's testimony about his investigations of Faiman, and there is considerable circumstantial evidence which makes his testimony convincing. See Wagman v. United States, 269 Fed. 568, 572; Ruby v. United States, 61 Fed. (2d) 617. Furthermore, since evidence of fraud in making and filing income tax returns must be clear and convincing, and since the respondent relies principally upon Faiman's testimony, there must be a conviction that Faiman's testimony is true, or it cannot be given weight. Equal care has been taken in analyzing the testimony of petitioner, and of all of the witnesses which he called. Petitioner denies receiving rebates of any kind from Faiman. Comment is made hereinafter about petitioner's testimony. The testimony of Faiman has been analyzed against the background of the whole record. He testified *132 about his business transactions with the petitioner in his capacity of traffic manager of the Fuller Brush Company as far back as 1932 in considerable detail; his testimony is clear, direct and candid. His testimony on cross-examination was not contradicted or impaired. There is testimony of others in the record which shows that Faiman made statements to them which is consistent with his testimony in this proceeding. There is in the record, also, the testimony of one witness to the effect that Faiman made statements to him which were inconsistent with his statements to others at about the same time. Upon the whole record in this proceeding, however, and from our observation of Faiman as a witness it is our judgment that he has told the truth in this proceeding. His testimony is convincing and leaves, in the end, a persisent judgment that he shared commissions with petitioner and paid him rebates on shipments and other types of rebates during the period 1933 to 1941, inclusive. The essential facts have been set forth in the findings of fact, and it is unnecessary to repeat them here. The arrangement whereby Faiman acted as a so-called broker for shipments of Fuller Brush going to *133 Ohio and other western areas, stands out from all of the record as warranting special scrutiny. If there were none of the usual business reasons for the arrangement, it takes on the color of a sham procedure which had as its chief, if not only purpose, charging another carrier or other carriers for rebates on the shipments which he or they carried with some regularity to Ohio and other areas. Petitioner admits that Faiman acted as a so-called broker for these shipments for a considerable period of time, and that commissions were charged. The record shows that all of such shipments were billed to Fuller Brush on statements of Connecticut & Ohio, which was only a name; that since 1933 all of the so-called brokerage business was done under that name, and involved only Fuller Brush shipments. When Faiman's application to the Interstate Commerce Commission came on for a hearing, no carrier supported his application, and the only witness for Faiman was petitioner. If Faiman had been carrying on a bona fide brokerage business, it is only reasonable to believe that his application for a broker's license would have received support in addition to that of petitioner. The broker's fee or commission *134 in such business is for certain services which are of value to the carrier. The record raises questions whether Faiman's so-called commission, which was at the rather substantial rate of 20 per cent for five years, was one which any line carrying regular shipments of Fuller Brush really needed to pay. It appears that there was either only one carrier, the Ward Line, which dealt with Faiman, or that such carrier received almost all of the shipments. The record leaves us with considerable doubt about the existence of any need for Connecticut & Ohio (Faiman) acting as a "middleman" between that carrier and other carriers and the traffic department of Fuller Brush, which could have dealt directly with Fuller Brush. Fuller Brush had a good shipping department and a competent traffic manager. There was apparently little, if any, need for using a broker in arranging for shipments. The officers of the Company did not know that a broker was being used; they did not know that Connecticut & Ohio was only a name for a broker, Faiman. The record shows that petitioner and Faiman maintained social relations; petitioner admits that they were "quite" friendly. This was not in itself indicative of *135 any improper business arrangements, but it is an important factor when considered with other facts. For example, after Loren Ward died the so-called commissions of Connecticut & Ohio were reduced to 6 per cent. And, after Faiman took in three associates in the middle of 1941, to obtain needed capital, all rebate payments ended. Since secrecy had to be maintained, a close working together, and the absence of any associates was necessary. Finally, there is evidence that prior to the enactment of the Motor Carrier Act, petitioner approved payment of duplicate freight bills of Connecticut & Ohio. Fowler, the treasurer of Fuller Brush, has testified categorically that these payments were not later refunded to Fuller Brush, as would be done if double payment for a shipment had been made by mistake; and that he was convinced that the bills represented duplicates because it was highly unlikely that identical shipments would be made. The denial of Faiman's application for a broker's license in June of 1941, brought to an end the brokerage business. His taking in associates brought to an end the payment of rebates on shipments over Faiman Motor Lines. Noble's investigation disclosed violations *136 of the license of Faiman Lines in 1941. When it was all over, Faiman admitted the rebate practices. All of the circumstances and many items of evidence in the record make Faiman's testimony convincing. Petitioner's testimony does not destroy the high degree of probability which we find in Faiman's testimony. And it does not serve to extricate petitioner from the charges of participation in the questionable arrangements. In view of the seriousness of the charges which are contained in Faiman's testimony, it is only reasonable to expect that petitioner would have testified at length in denial of Faiman's lengthy testimony and in declaration of his, petitioner's, innocence, if he were able to do so; that he would have exposed the fallacies of Faiman's story covering a period back to the latter part of 1932, if there were fallacies; and that he would have challenged Faiman in open court to persist in making untrue statements which were of a very damaging nature. However, petitioner had very little to say about the details of his management of the Fuller Brush shipping department, and of his business relations with Faiman; and his brief testimony amounted to little more than a denial. *137 The respondent introduced in evidence figures showing the total deposit in the bank account of petitioner's wife in each of the years in question. These deposits exceed in each year petitioner's income from salary and dividends. Due weight has been given to the evidence which petitioner submitted in his attempt to account for the surplus money evidenced by these deposits. It is a necessary circumstance that payments of rebates would have been made secretly and in cash. The fact that all of the bank deposits are not accounted for serves to support the respondent's determination that petitioner received income in addition to his salary and dividends, and to corroborate Faiman's testimony. However, it is also conceivable that very little of the unreported income would have been deposited in the bank account. It could have been consumed by current expenditures without passing through a bank account. Certain circumstances have been observed which we believe should be mentioned, briefly. The record does not indicate that petitioner acquired property in any amount which would absorb the disputed income, but there is testimony that there were purchases of securities, and the income tax *138 returns of petitioner show that dividend receipts increased as follows: 1935
$ 43.00
1936
99.50
1937
169.00
1938
141.50
1939
220.25
1940
281.35
1941
311.50 The receipt of stock bonus from Fuller Brush Company in 1939 and 1940 does not account for the increases in dividends. There is evidence that petitioner's wife and mother-in-law owned and bought stocks, but the record does not show how much, nor what the securities were, nor the sources of the funds with which they were acquired. Petitioner failed to state categorically what his own stock holdings were in each of the taxable years. He indicated that his wife purchased stocks, and left to her the task of testifying on the matter. She failed to complete testimony on these points. [2] Even so, we fail to perceive any good reasons for petitioner's professing to be ignorant of the financial transactions of his wife, and of failing to freely state his own. Furthermore, the testimony of Faiman about the frequency of payments and his rough estimates of annual amounts called for rebuttal by petitioner of some kind. Bank deposits do not serve to account for income or expenditures, whereas expenditures are indicative *139 of income. Petitioner failed to give estimates of the annual expenditures of himself and of his family. See Louis Halle, 7 T.C. 245, 249; Hoefle v. Commissioner, 114 Fed. (2d) 713. Petitioner cites Dubiske v. Commissioner, 58 Fed. (2d) 51, as authority for his contention that no weight should be given to the testimony of Faiman. We have considered this case, and observe that in that case the testimony of and adverse witness was found to be inconsistent and opposed to certain record evidence. That is not the situation in this case. Faiman's testimony has not been contradicted by evidence apart from the general denial of petitioner, and it is corroborated in several respects. It is concluded that in each *140 of the years 1933 to 1941, inclusive, petitioner received money from Faiman, which constituted income. Such income was not reported by petitioner in his tax returns. Respondent's contention that the tax returns for each year were false and fraudulent with intent to evade tax is sustained. M. Rea Gano, supra; Frank A. Maddas, supra. It is held that part of the deficiency in tax in each year was due to fraud with intent to evade tax, and that respondent properly added the statutory penalty to each deficiency. The Amount of Petitioner's Unreported Income for Each Year Under this issue the burden is upon the petitioner to prove the correct amount of his income. Snell Isle, Incorporated v. Commissioner, 90 Fed. (2d) 481. The respondent's determinations are prima facie correct, and it is petitioner's burden to overcome that statutory presumption. Avery v. Commissioner, 22 Fed. (2d) 6. Petitioner has failed to introduce evidence to show what the correct amount of all of his income in each of the taxable years was. As was said in Louis Halle, supra, it is the duty of a taxpayer to report his entire income and to keep such records *141 or evidence as will establish the amount thereof. Respondent's evidence under the fraud issue related to payments to petitioner, and the approximate amounts thereof. Petitioner failed to rebut this evidence. The record indicates that petitioner received during the period in question, at least the total amount of $27,795.24. Under this issue, respondent's determinations are sustained for failure of proof. Decision will be entered for the respondent. Footnotes
1. Title 49, par. 16 to end, U.S.C.A., page 221 (Cumulative Annual Pocket Part). SEC. 322. UNLAWFUL OPERATION. (a) Violation of chapter or rules or orders; penalty where none otherwise provided. Any person knowingly and willfully violating any provision of this chapter, or any rule, regulation, requirement, or order thereunder, or any term or condition of any certificate, permit, or license, for which a penalty is not otherwise herein provided, shall, upon conviction thereof, be fined not more than $100 for the first offense and not more than $500 for any subsequent offense. Each day of such violation shall constitute a separate offense. * * *
(c) Participation in unjust discrimination; evasion of regulations; penalty. Any person, whether carrier, shipper, consignee, or broker, or any officer, employee, agent, or representative thereof, who shall knowingly offer, grant, or give, or solicit, accept, or receive any rebate, concession, or discrimination in violation of any provision of this chapter, or who by means of any false statement or representation, or by the use of any false or fictitious bill, bill of lading, receipt, voucher, roll, account, claim, certificate, affidavit, deposition, lease, or bill of sale, or by any other means or device, shall knowingly and willfully assist, suffer or permit any person or persons, natural or artificial, to obtain transportation of passengers or property subject to this chapter for less than the applicable rate, fare, or charge, or who shall knowingly and willfully by any such means or otherwise fraudulently seek to evade or defeat regulation as in this chapter provided for motor carrier or brokers, shall be deemed guilty of a misdemeanor and upon conviction thereof be fined not more than $500 for the first offense and not more than $2,000 for any subsequent offense.↩
2. Mrs. Ellegard was called by petitioner on the first day of the trial. Upon objections to certain testimony, petitioner's counsel stated that he would withdraw the witness at that time, but that he would endeavor to present certain statements the following day. Mrs. Ellegard was recalled, subsequently. She did not complete her testimony on various matters, despite opportunity to do so and to overcome any previously sustained objections.↩